UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

                                      Case No. 17-cr-20183-2

v

                                      HON. MARK A. GOLDSMITH

D-2 JANETTE GAGGO TAWFIK,

    Defendant.

_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S REQUEST FOR PRETRIAL RELEASE AND DENYING**
**THE GOVERNMENT'S MOTION TO SUPPLEMENT THE RECORD (Dkt. 40) AS**
**MOOT**

A grand jury indicted Defendant Janette Tawfik on six charges stemming from her alleged role in an extensive human trafficking and drug-distribution conspiracy at the Victory Inn hotel (the "Victory Inn") on Michigan Avenue in Detroit, Michigan (Dkt. 17). Each charge carries a statutory presumption of detention. Applying both sides' proffered evidence to the factors in 18 U.S.C. § 3142(g), this Court finds that Tawfik has rebutted the presumption of detention. Nevertheless, for the reasons stated below, the Court orders Tawfik detained pending trial.

**I. BACKGROUND**

After a hearing, the magistrate judge found that Tawfik could not overcome the presumption of detention and ordered her detained because there is no "combination of conditions that would reasonably assure the safety of the community." See Detention Order at 2 (Dkt. 28). Tawfik gave oral notice of her intent to seek pretrial release from this Court, but did not file any written appeal or motion. This Court held a hearing on her request for pretrial

release on April 6, 2017, at which both sides proffered evidence. Following the hearing, this Court ordered both sides to submit proposed orders (Dkt. 39), which they timely did.

### A. The Government's Proffered Information

The Government's primary argument is dangerousness, but it also argues that Tawfik is a flight risk. The Government proffered the following items to support detention: (i) the pretrial services report recommending detention, (ii) 11 video clips from the Victory Inn's surveillance system, (iii) eleven screen shots from the Government's pole camera video, (iv) 13 independent victim and witness statements — eight of which described Tawfik's criminal involvement, and (v) the criminal histories of the co-defendants. From these sources, the Government claimed that the following facts support detention.

#### 1. The Initial Investigation and Surveillance

The federal investigation began in September 2016, when a human trafficking and heroin overdose victim ("Victim 1") told federal agents from Homeland Security Investigations ("HSI") about a conspiracy for the sale of women and drugs at the Victory Inn, orchestrated by Tawfik's co-defendant Darrick "Tone" Bell, a convicted murderer and drug dealer with several firearms convictions. Victim 1 stated that she had swallowed the drugs to avoid detection, as ordered by Bell, leading to her emergency room conversation with HSI agents.

In subsequent interviews, Victim 1 confirmed that Bell is the leader of the conspiracy, that he uses drugs to coerce the human-trafficking victims, and that she was terrified of his physical assaults. Victim 1 said that the Victory Inn staff was part of the conspiracy and would direct sex dates to certain rooms.

Another human trafficking victim ("Victim 2") described an extensive drug and human-trafficking operation headed by Bell, in which she and other women had been held against their

will for several weeks. Victim 2 stated that the conspirators forced women to perform sex acts for money in exchange for a room at Victory Inn and for drugs to support their addictions. Victim 2 said that the Victory Inn staff was complicit in the criminal activity, and that they only use a handful of rooms at the hotel for legitimate customers.

On November 3, 2016, Detroit Police and Detroit EMS responded to a female drug overdose victim ("Victim 3") in room 118 at the Victory Inn. While assessing Victim 3, Detroit Police talked to co-defendant Terry "T" Pruitt at the door of room 118. On a Detroit Police bodycam video, Pruitt casually discusses the fact that he can procure prostitutes for customers.

On November 4, 2016, Detroit police spoke to a female victim ("Victim 4") at a gas station near the Victory Inn. Victim 4 stated that she was a prostitute who lived at the Victory Inn and that Bell frequently delivered drugs to the hotel. A few days later, HSI installed a nearby pole camera to conduct surveillance on the Victory Inn.

On November 23, 2016, a reliable confidential informant told police that multiple drug dealers, including co-defendant Shelvie Avery (also known as "Q"), were working out of the Victory Inn. The informant said that Avery rents rooms out of the Victory Inn to work as many as eight prostitutes, and he sells heroin and crack cocaine. This informant subsequently told police that the Middle Eastern female manager (which accurately describes Tawfik) frequently spoke with Avery in private.

In early December, Detroit Police began conducting surveillance at the Victory Inn along with HSI. They observed dozens of apparent hand-to-hand drug deals and commercial sex dates in several different rooms. The police performed traffic stops on several customers who left after short stays, three of whom attested to rampant drug and prostitution activity at the Victory Inn.

3

Victim 6 was apprehended after attempting to flee the Victory Inn. She admitted that she was a frequent resident of the Victory Inn and lived with Avery. She admitted to prostituting herself at the hotel to repay Avery, who sold her cocaine and heroin. Victim 6 stated that Avery and others have as many as 20 female sex workers at the Victory Inn, and that the pimps work for Bell. She also said that Bell delivers narcotics to the hotel daily and collects cash from the previous day's narcotics sales. Victim 6 also stated "a hotel manager named Janette," i.e., Tawfik, is present during drug and sex deals. Victim 6 further stated that Bell beat to death a female known as "Juicy" for failing to pay her drug debt.

On December 26, 2016, Dearborn Police responded to a drug overdose call for a woman at the Best Value Inn hotel in Dearborn, Michigan, which is a few blocks from the Victory Inn. The female victim ("Victim 7") died at the scene. Victim 7's boyfriend stated that she had ingested drugs that they had purchased that day at the Victory Inn.

On December 29, 2016, another reliable confidential informant told police that multiple people, including Avery, were selling drugs and "pimping" women at the Victory Inn. This confidential informant said that Avery used several rooms for selling cocaine and heroin that he gets from Bell, as well as women. The confidential informant also stated they saw Avery pay the "hotel manager Janette," i.e., Tawfik, large sums of money from the drug sales and commercial sex. The informant further stated that Tawfik is in a romantic relationship with Bell.

2.    **The January 2017 Search Warrant**

On January 12, 2017 at 6:00 a.m., HSI and local police executed a federal search warrant for 25 rooms at the Victory Inn. During the execution, agents rescued 14 lethargic female human-trafficking victims who were suffering from drug withdrawal in disheveled rooms. They arrested co-defendant Michael "Man" Randol after he tossed 35 grams of crack cocaine from a

4

room window. Agents also recovered one loaded firearm, narcotics, narcotics paraphernalia, and dozens of cell phones. Most of the hotel rooms contained extensive evidence of recent drug use (e.g., used needles, used baggies, etc.). Agents also seized the Victory Inn's encrypted video surveillance data from the hotel's cameras, and records including thousands of handwritten room receipts.

After rescuing the human-trafficking victims from the Victory Inn, agents were able to interview some of them, who allegedly confirmed that Tawfik — along with her "boyfriend" Bell and the other co-defendants — controlled, directed, and participated in the drug distribution and prostitution schemes at the Victory Inn. More than one victim stated that Tawfik abused them. According to some, Tawfik was so abusive that the victims referred to her as the "Dragon Lady."

### 3. Post-Search Investigation

After the search warrant, agents conducted independent interviews with three other reliable sources with first-hand corroborated information on the Victory Inn conspiracy. The sources confirmed that Tawfik was in a romantic relationship with Bell, acted as Bell's right-hand person at the Victory Inn, acted in concert with the co-defendants, collected cash from the drugs and human trafficking in the form of room "rents," physically and emotionally abused and directed the female victims to prostitute themselves, and that minor victims were involved.

### 4. The Evidence from the Victory Inn

The Government proffered that its preliminary review of the pole camera video and pictures shows a massive volume of apparent hand-to-hand drug and commercial sex transactions from almost every Victory Inn room across a period of two months.

5

Agents also recovered approximately 14,300 hours of encrypted video from the Victory Inn's 13 surveillance cameras. At the time of the hearing, agents had been able to review 66 hours (about 0.04%) of the video, which show hundreds of drug transactions; widespread prostitution; violence; and members of the conspiracy, including Tawfik, involved in these activities. Eleven video clips from this initial sample, which were shown at the hearing, appear to reveal drug transactions, forcible movement of human-trafficking victims, and drug use (including at least one apparent overdose that lasted a considerable amount of time yet went unaddressed).

A January 6, 2016 clip, from approximately 12:15 a.m., shows Tawfik walking into and out of room 214, which was Avery's room. In the clip, Tawfik casually interacts with apparent human-trafficking victims. One of the victims walks into room 214, and a moment later Tawfik walks out brandishing a handgun, which she then conceals in her clothing. Tawfik does not have a concealed pistol license. Another victim and a man then walk into room 214, and Tawfik walks back into the room before leaving with a different man. A January 7, 2016 clip, from approximately 2:27 a.m., shows a man with a woman who purchases and tastes a white powder from room 214.

A January 8, 2016 clip shows Tawfik sitting at the Victory Inn's front desk viewing a computer screen displaying video feed from the hotel's surveillance cameras. A few minutes into the clip, Avery walks in and hands Tawfik a stack of cash, which she counts out. (At the hearing, Tawfik claimed that Avery was handing Tawfik a snack.) A January 12, 2016 clip, from approximately 5:40 a.m., shows Avery leaving room 214 about 20 minutes before agents executed the federal search warrant.

According to the Government, its preliminary review of sample room receipts show extensive cash transactions with multiple co-defendants, using multiple rooms, across several months. For example, two receipts from 2016, each for a full week, show Tawfik renting rooms to Bell and "Seven," a known prostitute.

      5.      **Tawfik's Co-Conspirators**

Tawfik has one recent fraud conviction. Her co-conspirators have extensive records of violent, drug, and weapons convictions. Randol has six felony controlled-substance convictions and a firearms conviction. Nero has six felony controlled-substance convictions. Pruitt has four felony controlled-substance convictions, a felony-firearm conviction, and an armed-robbery conviction. Avery has at least six felonies, including firearm and controlled-substance convictions. And Bell has three felony weapons convictions, two felony controlled-substance convictions, an assault-with-a-dangerous-weapon conviction, and a murder conviction.

In the detention hearing before the magistrate judge, defense counsel, on behalf of Tawfik, "vehemently denie[d] any type of romantic relationship with this individual . . . [Bell]." See Detention Hr'g Audio at 39:52-4:03 (Dkt. 26). In contrast, in a series of Tawfik's text messages from November 30, 2016, Tawfik stated to a close family member, whom she referred to as "My Pride & Joy," that "whoever tried to harm him or use his name in a negative format will be by worst enemy . . . I love him and am madly in love w/ him!!!! He completes me. I'm praying for the day that we unite as one in front of god and the world." Tawfik then texted to "My Pride & Joy" that "yo[u] and [three other family members] and [T]one [i.e., Bell] are my life[,] I'm living for the 5 of [yo]u!!!!" Tawfik also texted that Bell is "the definition of man he's the paragon of man[,] power[,] respect[,] and dignity[,] he has become the beacon of light in my life . . . He's my halo and that's on [yo]ur life."

7

### B. Tawfik's Proffered Information

To overcome the statutory presumption of detention applicable to the charged offenses, Tawfik proffered her family connections to the area, status as a divorced mother of four, work history, and limited criminal history. Tawfik also proffered that she was simply a clerk, whose collection of cash was done in the course of her normal duties, as most transactions at the Victory Inn were done in cash. She further proffered that she was employed at a different hotel in Southfield and was involuntarily transferred to the Victory Inn.

Tawfik concedes that she was aware that the premises had been used for prostitution, drug use, and drug dealing, but she claims that she was not involved. Tawfik stated that she instructed prostitutes to get to work, not as a sign of control, but because she had advanced them money on their hotel rooms. Tawfik said she carried a registered handgun because of the dangerous people and location, not as part of a role in the conspiracy.

Before the magistrate judge, Tawfik's counsel also claimed that she had never been in a relationship with co-defendant Bell — although her proposed order appears to abandon this argument, acknowledging the Government's claim that the two were romantically involved but not refuting it in any way. Tawfik does maintain that she never had a joint bank account with Bell, that she was not aware of his true character and history until the detention hearing, and that she has no intent to associate with him in any way in the future.

Tawfik has surrendered her passport to counsel and, if released, plans on living at home with her four children while continuing to work at a laundromat in Oak Park, Michigan. She is willing to consent to monitoring of her phone, wearing a GPS tether, and/or any other condition of release that this Court deems appropriate.

## II. ANALYSIS

The district court has original jurisdiction over the matter and reviews the magistrate's order of detention de novo. See 18 U.S.C. § 3145.

"When a 'judicial officer finds that there is probable cause to believe' that a defendant committed one of the crimes listed in section 3142(e)(3), there is a presumption in favor of detention: 'Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community[.]'" United States v. Stone, 608 F.3d 939, 945 (6th Cir. 2010) (quoting 18 U.S.C. § 3142(e)(3)). "A grand jury indictment, by itself, establishes probable cause to believe that a defendant committed the crime with which he is charged." United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985). "Section 3142(e)(3)'s presumption in favor of detention imposes only a 'burden of production' on the defendant, and the Government retains the 'burden of persuasion.'" Stone, 608 F.3d at 945. "Although a defendant's burden of production 'is not heavy,' he must introduce at least some evidence." Id.

"Even when a defendant satisfies his burden of production, however, the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court." Id. "The presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." Id. "To rebut the presumption, therefore, a defendant should present all the special features of his case that take it outside the congressional paradigm." Id. at 946.

The grand jury found probable cause and indicted Tawfik for three sex-trafficking charges (Counts 1, 2, and 3). All three are offenses under Chapter 77 of Title 18, United States Code, carrying a maximum term of imprisonment of twenty years or more. Each count, due to its term of imprisonment, triggers a rebuttable presumption in favor of detention. See 18 U.S.C.

9

§ 3142(e)(3)(D).

The grand jury did the same for Tawfik's three controlled-substance charges (Counts 4, 7, and 9). All of these have a maximum term of 10 years or more. These counts also create a presumption of detention. See 18 U.S.C. § 3142(e)(3)(A).

Tawfik argues that much of the Government's proffer is hearsay evidence. But hearsay rules do not apply to detention hearings. See 18 U.S.C. § 3142(f) ("The rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing."); see also Fed. R. Evid. 1101(d)(3) ("These rules — except for those on privilege — do not apply to . . . considering whether to release on bail or otherwise."); Bourjaily v. United States, 483 U.S. 171, 177-178 (1987) (same).

Applying the proffers to the factors below, the Court finds that, while Tawfik has rebutted the presumption of detention, consideration of all of the evidence — including the evidentiary weight of the now-rebutted presumption — requires detention.

**A. Nature and Circumstances — 18 U.S.C. § 3142(g)(1)**

Title 18 U.S.C. § 3142(g)(1) states:

> (g) The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, take into account the available information concerning—
>
> > (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device.

The Government's proffer — based on several witness statements and the videos — and the grand jury's indictment implicate several of the express factors under 18 U.S.C. § 3142(g)(1). These weigh heavily in favor of detention.

First, Counts 1, 2, and 3 all involve human trafficking in violation of Title 18 U.S.C. § 1591, which is an express factor in favor of detention under 18 U.S.C. § 3142(g)(1) ("whether the offense is . . . a violation of section 1591"). By definition, human trafficking is a violent, fraudulent, and coercive crime. See 18 U.S.C. § 1591(a) ("force, threats of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act[.]"). Here, multiple proffered witnesses stated that the conspirators — including Tawfik — employed beatings, various threats, degrading actions, and dangerous addictive drugs to coerce the human trafficking victims into commercial sex acts. Bell allegedly killed one female victim ("Juicy") for failure to pay a drug debt. Tawfik even proffered that she told the female victims, knowing they were selling their bodies, to get out and "work" to pay for the rooms. During the January 12, 2017 search warrant, agents rescued over a dozen lethargic and addicted female victims clustered in disheveled rooms.

Counts 4, 7, and 9 are controlled-substance offenses, which is another factor. See 18 U.S.C. § 3142(g)(1) ("whether the offense . . . involves a controlled substance"). The proffered evidence showed the impressive scale of the conspiracy's drug distribution. Agents surveilled hundreds of drug transactions, and recovered extensive evidence of drug use and distribution during the search warrant. Again, several proffered witnesses stated that Tawfik was directly involved in the drug conspiracy, and she is on video carrying a gun out of Avery's room 214 while customers mill about.

11

The Sixth Circuit "routinely affirms, on dangerousness grounds, the pre-trial detention of run-of-the-mill drug dealers, even without any indication that the defendant has engaged in violence." Stone, 608 F.3d at 947 n.6; see also id. ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community."); United States v. Gray, 20 F. App'x 473 (6th Cir. 2001) (conspiracy to possess with intent to distribute seven kilograms of cocaine; testimony from family members insufficient to overcome the presumption). There is more here than simple drug dealing, including strong evidence of violence, coercion, and several overdoses linked to Victory Inn drugs. On the November 3, 2017 police video alone, co-conspirator Pruitt brazenly discusses sex trafficking while a victim overdoses inside room 118 — activities of which Tawfik concedes she was aware and in which she was involved, according to several sources.

Tawfik is on video carrying and concealing a handgun, and, whether the gun was registered or not, this is another specified factor in favor of detention. See 18 U.S.C. § 3142(g)(1) ("whether the offense . . . involves a firearm"). According to Tawfik, under Michigan law, a person is permitted to carry a concealed pistol "in his or her dwelling house, place of business, or on other land possessed by the person". Mich. Comp. Laws § 750.227. Michigan courts, however, interpret the "place of business" exception to apply only to a place of business in which the person has a "possessory interest." People v. Clark, 176 N.W.2d 427, 430 (Mich. Ct. App. 1970). Simply being employed at a place of business is insufficient to invoke the exception. Id.

Last, Tawfik's human trafficking and drug offenses carry stiff penalties, including mandatory terms of 15 or 20 years, and up to life in prison. These penalties reflect the serious nature of these crimes. See, e.g., Baldwin v. New York, 399 U.S. 66, 68 (1970) ("In deciding whether an offense is 'petty,' we have sought objective criteria reflecting the seriousness with

which society regards the offense . . . and we have found the most relevant such criteria in the severity of the maximum authorized penalty.").

The nature of the instant offenses, therefore, weighs heavily in favor of detention. The Government has provided clear and convincing evidence of a widespread conspiracy to sell drugs and engage in human trafficking and prostitution. That conspiracy involved violence, coercion, threats, and other conduct going well beyond garden-variety drug dealing, which alone is sufficient to justify pretrial detention. And the Government has submitted evidence that Tawfik, in addition to being potentially liable as a co-conspirator, possessed a firearm during the course of the conspiracy and issued threats in furtherance of the conspiracy.

### B. Weight of the Evidence — 18 U.S.C. § 3142(g)(2)

Title 18 U.S.C. § 3142(g)(2) instructs this Court to consider "the weight of the evidence against the person." The factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." Stone, 608 F.3d at 948; see also Hazime, 762 F.2d at 37 (weight-of-evidence factor "deals with the factors to be considered in determining whether there are conditions which will assure the appearance of the accused and safety of the community"). Here, there is evidence of Tawfik's dangerousness and risk of non-compliance weighing in favor of detention. Evidence of her dangerousness includes video evidence of her possession of a concealed pistol and the proffered evidence that she personally abused prostitutes. This evidence is in addition to all of the other facets of the conspiracy, for which she may be liable as a co-conspirator. Evidence of her risk of non-compliance includes her romantic involvement with Bell — which manifested, in part, as extreme expressions of loyalty to him — who remains at large. Other evidence of non-compliance includes the very lengthy sentences

that she faces, which Congress has deemed so suggestive of a risk of non-compliance that it established the presumptions of detention.

## C. History and Characteristics — 18 U.S.C. § 3142(g)(3)

Under this factor, this Court must consider the following:

> [T]he history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . . .

18 U.S.C. § 3142(g)(3).

Tawfik's history and characteristics are mixed. To Tawfik's credit, she has strong family connections to the area, a consistent work history, and only a single retail fraud conviction. It is on this basis that the Court finds that Tawfik has rebutted the presumption of detention.

"However, even where a defendant produces some evidence to rebut the presumption, 'the rebutted presumption retains evidentiary weight.'" United States v. Hoskins, 181 F.3d 105 (6th Cir. 1999) (quoting United States v. Dillon, 938 F.2d 1412, 1416 (1st Cir. 1991)). The Government's proffer includes evidence that Tawfik's character is lacking; Tawfik brought, or intended to bring, the convicted murderer and drug dealer Bell into her home with her children, and the fact that she has been consistently employed is severely undercut by the fact that this employment was at the Victory Inn. Although Tawfik claims ignorance of Bell's criminal record, she admits that she was at least aware of the criminal activities he allegedly undertook at

the Victory Inn, making her decision to bring him around her children quite troubling. Moreover, the evidence of Tawfik's romantic involvement with Bell directly contradicts her earlier assertion before the magistrate judge that she was <u>not</u> romantically involved with Bell. By misleading the magistrate judge, Tawfik has shown that she is untrustworthy, greatly reducing the value of her assertions that her family and community ties will act as a check on her dangerousness and/or flight risk.

The Government also proffered evidence that Tawfik conspired with other men who had long criminal records for violence, weapons, and drug dealing. As noted above, Tawfik herself proffered that she instructed prostitutes to get to work, and she was so abusive to some female victims that they referred to her as the "Dragon Lady."

The Court finds that Tawfik's character is lacking. Moreover, because some of the evidence of Tawfik's bad character involves bringing Bell around her children (who formed the primary basis for this Court's determination that she rebutted the presumption of detention), this factor ultimately weighs in favor of detention.

**D. Danger to Community — 18 U.S.C. § 3142(g)(4)**

Under the pertinent part of 18 U.S.C. § 3142(g)(4), this Court must consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

The Government's proffer shows that Tawfik unlawfully carried a concealed pistol; as noted above, this Court rejects Tawfik's argument that this was lawful simply because it occurred at her workplace. <u>See</u> <u>Clark</u>, 176 N.W.2d at 430. As noted above, Tawfik's decision to invite Bell into her home with her children, given her knowledge of Bell's activities, posed a danger to them. The Government also proffered extensive evidence of her involvement in a

15

large-scale drug distribution conspiracy at the Victory Inn. "To be sure, drug trafficking is a serious offense that, in itself, poses a danger to the community." Stone, 608 F.3d at 947 n.6; see also United States v. Leon, 766 F. 2d 77, 81 (2d Cir. 1985) ("the harm to society caused by narcotics trafficking is encompassed within Congress's definition of 'danger'")). There were also at least three overdoses traced to the Victory Inn conspiracy.

The Government's proffer supports that Tawfik had a managing role in facilitating, abusing, and coercing the female victims into commercial sex acts, an act from which she and her co-conspirators benefitted.

More dangerous still, Tawfik worked hand-in-glove with the convicted murderer Bell. She called Bell — the alleged violent ringleader and abuser of vulnerable women—the "paragon of man, power, respect, and dignity[.]" Tawfik declared her loyalty to Bell above any other person, writing "whoever tried to harm him or use his name in a negative format will be by worst enemy."

The grand jury indicted Bell, but authorities are still looking for him. Based on Tawfik's prior actions with Bell, and her declarations of love and loyalty to him, she poses an additional danger to others and herself.

**E. The Government's Showing Overcomes Tawfik's Proffer**

This Court is unconvinced by Tawfik's attempts to establish that she is not dangerous and that she intends to appear for trial. She volunteers to wear a tether, but a tether offers little assurance of an appearance or an intent to forego activities that pose a danger to the community. See, e.g., United States v. Edwards, No. 07-20605, 2010 WL 157516, at *5 (E.D. Mich. Jan. 13, 2010) (agreeing that tether "would be entirely insufficient to either insure Defendant's appearance or protect the community from the danger posed by Defendant"). The fact that

Tawfik surrendered her passport merely makes it more difficult — not impossible — to abscond internationally. See also United States v. McKnight, No. 2:11-MJ-0194, 2011 WL 1002977, at *1 (S.D. Ohio Mar. 15, 2011) (noting Congressional recognition that drug trafficking is lucrative and involves international contacts, enabling defendants to flee the country). And surrendering one's passport obviously does nothing to restrict one from engaging in behavior that endangers the community.

Accordingly, the Government proved by clear and convincing evidence that Tawfik presents a danger to the community and a risk of flight, and that no condition or combination of conditions could reasonably assure the safety the community and her appearance in court.

### III. CONCLUSION

For the reasons discussed above, the Court finds that Tawfik must remain detained pending trial. The Government's motion to reopen the record to submit additional proofs (Dkt. 40) is denied as moot.

SO ORDERED.

Dated: April 25, 2017           s/Mark A. Goldsmith
    Detroit, Michigan          MARK A. GOLDSMITH
                               United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 25, 2017.

                                               s/Karri Sandusky
                                               Case Manager