```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION


 3


 4   UNITED STATES OF AMERICA,


 5                    Plaintiff,


 6   -v-                                    Case No. 17-cr-20183


 7

     DERRICK DERNARD BELL, JANETTE
 8   GAGGO TAWFIK, SHELVIE LEWIS
     AVERY, TERRY PRUITT, HAROLD
 9   LASHAWN NERO, MICHAEL ANTHONY
     RANDOL, CHARLES THOMAS FORD, JR.,
10   KEMAL GABRAIL and JACK HANA YAKO,


11                    Defendants.
     _____/

12

13                      STATUS CONFERENCE

14         BEFORE THE HONORABLE MARK A. GOLDSMITH

15        Detroit, Michigan, Wednesday, May 23rd, 2018.


16


17   APPEARANCES:

18   FOR THE PLAINTIFF:      JEROME F. GORGON
                             WILLIAM M. SLOAN
19                           U.S. DEPARTMENT OF JUSTICE
                             211 West Fort Street
20                           Suite 2001
                             Detroit, MI 48226

21

22   FOR JANETTE GAGGO:      MICHAEL S. FRIEDMAN
                             2833 Crooks Road
23                           Suite 104
                             Troy, MI  48084

24


25
```

```
1    (Appearances, continued):

2

3    FOR SHELVIE AVERY:        RICHARD H. MORGAN, JR.
                               485 Orchard Lake Road
                               Suite 203
4                              Pontiac, MI  48341

5

6    FOR HAROLD NERO:          MARK H. MAGIDSON
                               615 Griswold Street
                               Suite 810
7                              Detroit, MI  48226

8

9    FOR TERRY PRUITT:         S. ALLEN EARLY, III
                               607 Shelby Street
                               Suite 425
10                             Detroit, MI  48226

11

12   FOR KEMAL GABRAIL:        DAVID M. BURGESS
                               1360 Porter
                               Suite 260
13                             Dearborn, MI  48124

14

15   FOR MICHAEL RANDOL:       NICHOLAS J. VENDITTELLI
                               6053 Chase Road
                               Dearborn, MI  48126
16

17   FOR JACK HANA YAKO:       DORAID B. ELDER
                               1360 Porter Street
18                             Suite 200
                               Dearborn, MI  48124
19

20

21   David B. Yarbrough, CSR, FCRR
     Official Court Reporter
22   (313) 234-2619

23

24

25
```

<pre>
 1                    TABLE OF CONTENTS

 2                                                    PAGE

 3    WITNESSES:

 4    NONE

 5

 6

 7

 8

 9

10

11

12

13

14

15                        EXHIBITS

16              (Identified)          (Admitted)

17    NONE

18

19

20

21

22

23

24

25
</pre>

```
1              Detroit, Michigan.
2              Wednesday, May 23rd, 2018.
3              At or about 2:53 p.m.
4                        --    ---    --
5         THE CLERK OF THE COURT:  Please rise.  The United
6  States District Court for the Eastern District of Michigan is
7  now in session, the Honorable Mark Goldsmith presiding.  You
8  may be seated.
9         The Court calls case number 17-20183, the United
10 States of America versus Janette Gaggo Tawfik, Shelvie Lewis
11 Avery, Terry Pruitt, Harold Lashawn Nero, Michael Anthony
12 Randol, Charles Thomas Ford, Junior, Jack Hanna Yako and Kemal
13 Gabrail.  Counsel, please place your appearance on the record.
14        MR. GORGON:  Good afternoon, your Honor.  Jerome
15 Gorgon for the United States.
16        MR. SLOAN:  Good afternoon, your Honor.  William
17 Sloan on behalf of the United States.
18        MR. FRIEDMAN:  Your Honor, good afternoon.  Michael
19 Friedman on behalf of Janette Gaggo -- oh.
20        MR. MAGIDSON:  Good afternoon, your Honor.  Mark
21 Magidson on behalf of Mr. Harold Nero who's present in court.
22        MR. VENDITTELLI:  Good afternoon, your Honor.
23 Nicholas Vendittelli on behalf of Mr. Randol.
24        MR. EARLY:  Good afternoon, your Honor.  S. Allen
25 Early on behalf of Terry Pruitt who's present today, your
```

1 Honor.

2        MR. FRIEDMAN:  Michael Friedman on behalf Janette

3 Gaggo.

4        MR. ELDER:  Doraid Elder on behalf of Mr. Yako who's

5 seated to my left along with the interpreter, your Honor.

6        MR. BURGESS:  Good afternoon, your Honor.  May it

7 please this Honorable Court, David Burgess on behalf of Kemal

8 Gabrail.

9        THE COURT:  All right, good afternoon.

10        MR. MORGAN:  Good afternoon, your Honor.  Richard

11 Morgan appearing for Shelby Avery.

12        THE COURT:  All right.  Now missing is Marlon Evans;

13 is that right?

14        MR. GORGON:  Correct.

15        THE COURT:  Is he the only attorney that's missing?

16        MR. GORGON:  Yes, your Honor.  Where is Mr. Ford?

17        DEFENDANT FORD:  Right here.

18        THE COURT:  Mr. Ford, we were informed shortly after

19 2:00 that Mr. Evans stated to us that he was in a courtroom in

20 another courthouse in Macomb County and that he wouldn't be

21 here.  We tried to see if the federal defender's office had

22 someone available to represent you at this hearing.  They did

23 not.  So I decided to have you brought up with your

24 co-defendants even though we don't have an attorney here for

25 you, so I'm going to be addressing this matter with Mr. Evans

```
1    at a later time and I want you to understand all of your rights
2    are going to be preserved so nothing here is going to impact
3    you until you've had a chance to have your attorney address
4    these issues with me.  Do you understand that, sir?
5              DEFENDANT FORD:  Yes.
6              THE COURT:  All right.
7              MR. MAGIDSON:  Judge, I could stand in for Mr. Evans
8    if that needs to be --
9              THE COURT:  Got to keep your voice up.
10             MR. MAGIDSON:  Judge, this is Mark Magidson.  I could
11   stand in for Mr. Evans with Mr. Ford's consent if that would
12   facilitate things.
13             THE COURT:  Well, Mr. Ford, would that be okay with
14   you?
15             DEFENDANT FORD:  No.
16             MR. MAGIDSON:  Okay.
17             THE COURT:  It's not okay, so as I said, we'll
18   proceed as I've just announced.  Now we have a defendant here
19   who has an interpreter so we'll ask her to identify herself.
20   We're going to swear her in.
21             INTERPRETER:  Rania Hijazeen, your Honor.
22             THE CLERK OF THE COURT:  Please raise your right
23   hand.  Do you solemnly swear or affirm under penalty of perjury
24   that you will accurately translate to the defendant all
25   proceedings including statements and questions of Court and
```

1    counsel and that you will accurately translate the defendant's

2    responses to any questions posed to him?

3              INTERPRETER:  Yes, I do.

4              THE COURT:  All right.  How do you want to proceed

5    this afternoon?

6              MR. GORGON:  Your Honor, what I thought might be most

7    useful for the Court is to give you a brief chronological

8    overview of where we are, where we're headed and then I'll give

9    you more detail about each step if that's okay with the Court.

10             THE COURT:  Go ahead.

11             MR. GORGON:  Would you like me to speak from here or

12   from the lectern?

13             THE COURT:  Where ever is more comfortable for you.

14   As long as you can be heard, you can stay there.  If you want

15   to move to the lectern, that's fine.

16             MR. GORGON:  Sure, thank you.  Our last talk with the

17   Court, your Honor, was March 20th, 2018.  There are a series of

18   discovery issues that we dealt with and we've made some, I

19   think good progress.  On April 24th after some discussion with

20   defense counsel, we were able to file the joint statement

21   regarding discovery.  On May 4th, 2018 the government provided

22   in response to a request a diagram of the hotel with camera

23   positions in e-mail to defense counsel and I believe I CC'd the

24   Court.  On May 14th, the government provided the second list on

25   time with the order to defense counsel and that would put our

1   next production, hopefully our last production, but our next

2   production August 14th, 2018.  So that's the timeline of what's

3   happened.

4           Within the joint statement that was filed, there are

5   a few areas of disagreement that we can address, but there were

6   two issues that the government would like some direction from

7   the Court on.  Issue number one was a request by defense

8   counsel to get a series of photos of defendants from the U.S.

9   marshals.  I made the request of the marshals.  They want a

10  protective order.  The government is happy to draft that.

11  Defense counsel is fine with stipulating to that.  I just need

12  the Court's okay and I'll get a protective order drafted for

13  the Court's approval that we can provide to the marshals.

14          THE COURT:  Well, have you worked out the language

15  with your fellow counsel?

16          MR. GORGON:  No, but I don't expect this to be

17  contentious.  I think it'll be very simple.  I can get it done

18  within a day, so that's number one as long as the Court's okay

19  with it?

20          THE COURT:  That's fine with me.

21          MR. GORGON:  Okay, and number two, there is some

22  disagreement over the nature of the information and the form of

23  the information that the government's going to be providing to

24  defense counsel so I CC'd the Court on the productions which

25  show these lists of potentially inculpatory events, brief

```
 1    description, date and time.  In addition to that, there's been
 2    a defense request that we also provide them with an index or
 3    table of contents and as we set out in our response, that's
 4    the -- I think that's the only area of contention that has to
 5    be resolved and I can tell you why.
 6             THE COURT:  You're saying the table of contents slash
 7    index is the only issue?
 8             MR. GORGON:  Um-hmm, as far as the government can see
 9    from a reading of that order and from our negotiating.
10             THE COURT:  Go ahead.
11             MR. GORGON:  I think that's the only outstanding
12    issue.
13             MR. FRIEDMAN:  If I may, your Honor, Michael
14    Friedman --
15             THE COURT:  Well, hold on.  Let's let the government
16    finish.  Go ahead
17             MR. FRIEDMAN:  Very well.
18             MR. GORGON:  And then on the May 4th disclosure, just
19    giving you a little more detail, there was a request
20    specifically by Mr. Morgan, but on behalf of all defense
21    counsel to provide a diagram of the Victory Inn floors showing
22    the location of cameras and in which direction they're pointing
23    to aid defense counsel in their review, so we've provided that
24    on that date.  There are a few cameras that are not accounted
25    for at this point because the data for those cameras has not
```

1  been reviewed in a way that could place the cameras on a

2  diagram.  If we get that, then I'll provide an updated diagram.

3          THE COURT:  So how many cameras are not accounted

4  for?

5          MR. GORGON:  Cameras four, 11 and 12.  And then the

6  last thing that I would give you a little more detail on, your

7  Honor, is the second production list which we provided on May

8  14th and I CC'd the Court on the letter has an additional 1,144

9  potentially inculpatory events so that, combined with the first

10  production list, the 567, puts us at 17,011 potentially

11  inculpatory events that we've identified.

12          THE COURT:  And how much time does that consume

13  roughly?

14          MR. GORGON:  I don't know the amount of time because

15  the way the list is provided is it just shows an approximate

16  time for the event.  It could be a few minutes before or after,

17  but, you know, we could say let's say it's two or three minutes

18  around a given event.  We're talking 34, 3,600 minutes.  I

19  think that's six, is that 600 hours or 60 hours?

20          THE COURT:  60.

21          MR. GORGON:  60 hours, so that's a quick calculation

22  in my head.

23          THE COURT:  Okay.

24          MR. GORGON:  And then the last -- I won't say the

25  last, that's optimistic, but the next production would be due

1    August 14th, 2018, but I would hope that after defense counsel

2    has had an opportunity to review some of these events, there

3    might be some movement on resolving certain defendants' cases

4    and if that's the case, your Honor, we may be able to start

5    narrowing the range of defendants down and any subsequent video

6    production would then be more narrow and limited.  So that's

7    where we're at.  Did your Honor have any questions for me on

8    any of this?

9         THE COURT:  Well, I do.  Are you envisioning playing

10   something like 60 hours or so of these --

11        MR. GORGON:  Never.

12        THE COURT:  -- video clips to a jury?

13        MR. GORGON:  Never.

14        THE COURT:  Okay.  So at what point do you really

15   think you're going to narrow down the universe of what's going

16   to be presented at trial?

17        MR. GORGON:  I think after two things happen.  Once

18   we get the broader universe so we have the cameras themselves

19   viewed down and I know there are X number, then we can whittle

20   it down.  That point in conjunction with when we know which

21   defendants, maybe all will go to trial, but it we know two or

22   three defendants are going to go to trial, I'll know I need

23   evidence focused on those defendants.  So when those two events

24   happen, I think we'll be able to get it down significantly.  If

25   I play more than a couple hundred, I think it would be a

1    mistake on my part.

2         THE COURT:  Couple hundred minutes or events?

3         MR. GORGON:  Events, at the high, high range.

4         MR. MORGAN:  That's a couple -- that's 200 hours.

5         MR. GORGON:  Events would be two to three minutes

6    hopefully, but this is hard for me to say at this point.  I'm

7    just trying to give the Court an idea.

8         THE COURT:  All right.  I wasn't clear on that first

9    event that would help give you clarity, something about

10   identifying cameras, so why don't you flush that out somewhat.

11        MR. GORGON:  Sure.  So up to this point we have given

12   two video lists.  Each one has contained two cameras, so there

13   are another, let's say four or five cameras to be reviewed and

14   once those cameras are reviewed, I'll be able to have a number,

15   like for example right now I know from the first two cameras,

16   there were 567 events.  The next two cameras, 1,144.  When

17   we've had the remaining cameras reviewed, let's say there's

18   another 1,500 events, then I'll know the total universe is

19   3,200 events and then I can cut it down from there.

20        Then I'll be able to further cut it down if some

21   number of defendants and the government reach resolution, so I

22   think both those events are going to be very significant and

23   will help us substantially narrow down the universe of clips

24   that we're going to play, and this is all to say I would expect

25   in the next several months, next six months to have a more

1    narrow case for the Court.

2          THE COURT:  Now the report that was submitted, the

3    joint statement regarding discovery, made an estimate or a

4    guesstimate perhaps is a better word that the case would be

5    ready for trial in the fall of 2019 and that was based on a

6    predicate that the first set of video clips amounted to

7    approximately 200 hours.  Now based on what you're saying now,

8    would you be saying the fall of 2019 is the earliest the case

9    could be brought to trial or does that change that prediction

10    do you think?

11          MR. GORGON:  That was a prediction provided by the

12    defense counsel and given the fact that once we review X number

13    of videos and provide them to defense counsel, we've already

14    done that work, but they then have the job of going and at

15    least replicating some portion of that review so they're are

16    always some period of time behind the government so when they

17    say September, 2019, I think that's reasonable.

18          THE COURT:  And I understand that's what the

19    government said in the joint statement.  I'm asking the

20    question regarding the basis for that prediction.  Is what

21    you're telling me now then what you're laying out for the

22    second round of production is not going to affect that

23    estimate?

24          MR. GORGON:  I don't think so because there are two

25    dynamics at play.  One is we're creating a greater volume of

1    inculpatory events for them to review, but I think at the same

2    time that provides defendants with more information that may

3    allow them to make intelligent and informed decisions about

4    pleas, so I think there's a counter-pressure which will help

5    narrow down the number of defendants who come to trial.

6          THE COURT:  All right.  Do you want to elaborate on

7    the government's objection to offering an index or a table of

8    contents unless the defendants agree to certain conditions?

9          MR. GORGON:  We laid out our reasons in writing and I

10   know the Court's read that.  I think number one, viewing the

11   list and I have copies if the Court doesn't have it, it's

12   really not a necessary or a helpful step.  We're not talking

13   about hundreds of pages.  I think it's quite doable and

14   reasonable for a person to review that 10, 12 or 15 pages and

15   see what event is of interest to them.

16         The second thing is, one, I don't know what this

17   index would contain, what terms it would contain, what a table

18   of contents would be attempting to achieve.  I'm not even sure

19   what the parameters would be, but we wouldn't -- one, the order

20   doesn't call for it and two, I don't think it's reasonable to

21   expect us to make these kind of work product decisions for

22   defense counsel to either display what our thinking and summary

23   of these events is or to open up whoever's going to be working

24   on that process to cross-examination based on it, so those are

25   the sort of three big reasons, your Honor.

1          I think we've given a very good faith and thorough

2     effort at producing these lists.  Two, going beyond that gets

3     into the area of work product and three, it opens up whatever

4     government witness is doing that to this potential

5     cross-examination.

6          THE COURT:  All right.  There's mention made in the

7     joint statement about the pace of review being impacted by how

8     many copies of the materials are actually available.  I guess

9     for some defense teams there's only one copy has to be shared

10    between attorneys and paralegals.  Is there any way to make

11    more copies of the materials to accelerate the review process?

12         MR. GORGON:  I don't think Mr. Antone is here.  He

13    would be someone that is important to talk to about that

14    process.  My belief is that Mr. Antone would have the capacity

15    to create additional copies.

16         MR. MORGAN:  Not so.  No, he cannot.

17         THE COURT:  Hold on.  Mr. Morgan, I think you're

18    trying to talk; is that right?

19         MR. MORGAN:  Yeah, that's not -- the problem, Judge,

20    is that --

21         THE COURT:  No, no, hold on.  Mr. Morgan, hold on.

22    I'm going to listen to the government.  Then I'm going to give

23    all the defense attorneys a chance to talk, too, so just hold

24    on.  Go ahead.

25         MR. GORGON:  So without having Mr. Antone here, I

1    won't say that I know definitively that Mr. Antone has the

2    capacity to create additional copies, but that's one possible

3    solution, so I don't know the answer.  It's an unknown.

4            THE COURT:  I think you had said in our conference on

5    a prior occasion that you had gone through two out of the nine

6    cameras at that time?  Is that right?

7            MR. GORGON:  Yes, your Honor, at the first one.

8            THE COURT:  So does this mean you've now gone through

9    six out of the nine?

10           MR. GORGON:  Four.

11           THE COURT:  Four?

12           MR. GORGON:  Um-hmm, and so production one covered

13   camera eight and camera three.  Production two covers camera

14   one and camera five.

15           THE COURT:  Is the next one August 14?  Is that

16   right?

17           MR. GORGON:  August 14, 2018.

18           THE COURT:  And that's going to cover all the rest?

19           MR. GORGON:  I don't know.

20           THE COURT:  You're going to do the best you can?

21           MR. GORGON:  Yeah, absolutely, absolutely and one

22   thing that's changed is I think the initial posture of defense

23   counsel was to give as many useful events as possible, but

24   subsequent statements from them now are that they want us to

25   narrow down the number of events that we're providing so I

1   talked to the agents and instructed them and if there are

2   marginal events, to exclude them.

3          THE COURT:  Marginal in the sense of marginally

4   inculpatory?

5          MR. GORGON:  Yeah, like maybe this is showing

6   something, maybe it's not, let's err on the side of inclusion

7   and now I'll ask them based on the defendants' request to err

8   on the side of exclusion.

9          THE COURT:  Have you identified any exculpatory

10  material?

11         MR. GORGON:  Not to my knowledge.  I have to say I

12  don't even know what an exculpatory event in something like

13  this would look like, but to my knowledge and reading of the

14  production list, there's nothing that, based on the

15  description, is exculpatory.

16         THE COURT:  There was a request made in the joint

17  statement by the defendants to have identities of persons

18  disclosed and room numbers to the extent possible.  I think the

19  government was going to endeavor to do that; is that right?

20         MR. GORGON:  Yes, your Honor.  So, the production

21  list where it's possible to identify a given individual by

22  their appearance, it will indicate in the list, for example Joe

23  Smith seen outside of room 108 at this point in time and the

24  one overlay, your Honor, is that the diagram that the

25  government provided which shows camera, for example camera one

1    looks down this hallway, camera five looks down this hallway,

2    will provide a physical point of orientation for everything

3    that's shown on a given camera.  I don't know if I provided

4    that to the Court, but do you mind if I pass one up so --

5              THE COURT:  That's fine.

6              MR. GORGON:  -- you have an idea?

7              THE COURT:  All right.  What did you want to point

8    out to me?

9              MR. GORGON:  So just for example, your Honor, on the

10   front page where it says attachment A, there's a number of

11   cameras that are pointed out so camera one, do you see that,

12   with an arrow pointing in the direction?

13             THE COURT:  I do.

14             MR. GORGON:  And there are various other camera

15   numbers, that -- and there's some cameras on the back as well

16   which is the other floor, in conjunction with a given list will

17   allow defense counsel to know everything that's on camera one,

18   on the list from camera one is from the perspective that it's

19   shown on that list, so it's helpful.  It orients them in place

20   and then the list orients them in time and provides the best

21   good-faith description that the agents working at this volume

22   and pace can provide.  So we're doing I think a pretty fair

23   effort to help them.

24             THE COURT:  So are you envisioning then the

25   government completing its production of discovery then by

1   August 14 or thereabouts?

2        MR. GORGON:  I don't know if the next list will be

3   all-inclusive.  I hope so, but I wouldn't bet that we're going

4   to finish all the remaining cameras based on the pace of review

5   up to this point because each one of those cameras that's left

6   is two months of video that have to be reviewed and there are

7   multiple agents working on it, so they're trying to do an

8   efficient, but useful job of reviewing that.  So I, I think

9   it's too optimistic to think that we would finish all the

10   remaining cameras by August 14th.

11        THE COURT:  Do you have even a ballpark idea?  Just

12   trying to understand when we might be able to set a motion

13   cut-off and try to at least sketch out when we might be seeing

14   motions.

15        MR. GORGON:  November.  That -- two more productions.

16   If in August we've made a really good progress and I think we

17   can guarantee we'll be done with these production lists by

18   November, but I think that's probably about right.

19        THE COURT:  In November you think we could set a

20   motion cut-off?  Approximately?

21        MR. GORGON:  Yes, sir and with the new instruction

22   from defense counsel that they want us to provide fewer

23   inculpatory events, that will help.

24        THE COURT:  All right.  Is there anything else you

25   want to tell me?

1          MR. GORGON:  No, your Honor.  Unless the Court had a

2     question, I'm -- I'm happy with what I've said.

3          THE COURT:  All right.  We're going to go around the

4     room and see if any of the defense attorneys want to say

5     anything, so let's start with Mr. Magidson.

6          MR. MAGIDSON:  The only thing I know from my client,

7     his primary concern is the length of time --

8          THE COURT:  Got to keep your voice up so we all can

9     hear you.

10         MR. MAGIDSON:  So from Mr. Nero's perspective, he's

11    been detained quite some time and we're talking still a long

12    time and that's his number one concern.  I've heard

13    Mr. Friedman in terms of the report and so forth, but I just

14    wanted to convey his concern due to the time that he's been

15    detained.  He's in a jail situation.  Jails have limited

16    facilities and they're not designed for long-term detention and

17    that's been a concern of Mr. Nero's.

18         THE COURT:  All right.  Well, do you have any

19    specific recommendations you'd like to offer?  I certainly want

20    to move this case as expeditiously as possible so if there's

21    anything concrete you want to recommend, I'm all ears.

22         MR. MAGIDSON:  So I agree with Mr. Gorgon in terms of

23    at one point we were thinking about looking at everything to

24    see, find exculpatory conduct and I wouldn't know what that

25    looks like frankly other than if my client were, I don't know,

1    swimming in a swimming pool?  I don't know what it would look

2    like so I think we can go off this list and avoid a lot of

3    extra time.

4              THE COURT:  Okay.  Let's go right down the line.

5              MR. VENDITTELLI:  I have nothing, your Honor.

6              THE COURT:  Okay.  Mr. Early?

7              MR. EARLY:  Your Honor, the only thing I would say is

8    that apparently these sticks that we have all these hours of

9    video on can be duplicated by a laboratory back east.  It's

10   very expensive however, so it would be up to the Court and

11   Mr. Ranz as to whether or not you want to approve this.  It

12   would speed up the time, however there would be some delay

13   because it takes this laboratory apparently some time to make

14   the duplicate.

15             THE COURT:  Have you discussed this with Mr. Antone?

16             MR. EARLY:  Mr. Antone has mentioned it to me and I

17   don't remember the exact price.  I have discussed it with him,

18   but I don't remember the exact price that he quoted for the

19   stick for a duplicate.  I think that could be determined rather

20   quickly by someone tomorrow, but that was the hold-up, the

21   finances.  That was one part.

22             THE COURT:  All right.  Well, I can certainly make an

23   inquiry of Mr. Ranz at the Sixth Circuit to have him get in

24   touch with Mr. Antone to see whether it would make sufficient

25   economic sense to order some more sets of materials based on

1   the timing and the expense that would be approved at the Sixth

2   Circuit level, so I can undertake to do that.  All right?

3   Mr. Friedman?

4       MR. FRIEDMAN:  Yes, thank you, Judge.  The government

5   mentioned trouble identifying possible exculpatory information

6   and let me pose a hypothetical.  For example and I believe

7   there is material to this effect in what I have viewed already,

8   I can't cite chapter and verse.  Someone comes in, confronts

9   one of the defendants and says give me 20 bucks so I can get

10  some drugs and they are refused.  I would think that classifies

11  as potentially exculpatory information and I think in the

12  government's review of this information, they ought to be able

13  to point that out to us.

14       In addition on page six of the joint statement, the

15  government request that as far as the list that it's providing

16  us is concerned, that the defense agrees not to use the list in

17  any way against any potential government witness and I think

18  frankly that is impeding our right of cross-examination.  We

19  understand that this is a draft list.  We understand it's not

20  all inclusive either as far as inculpatory or potentially

21  exculpatory material is concerned, but if there's a gross

22  oversight of something and a witness is on the stand talking

23  about the list, we should at least be able to get into that

24  with the individual.

25       The only other point that I want to make is with

```
 1   respect to the time.  The government said with each video clip
 2   if it lists a specific time, that the review should be maybe a
 3   couple minutes before and I'm not sure if they said before and
 4   after.  We have been trying to confine ourselves to
 5   approximately five minutes before, five minutes after.  In my
 6   review already I found it useful to certainly go beyond two
 7   minutes after a specific event and I think those are the only
 8   points I wanted to bring to the Court's attention.
 9           THE COURT:  Okay.
10           MR. ELDER:  Your Honor, I have nothing to add.
11           MR. BURGESS:  I don't as well, your Honor.  I don't
12   have anything to add.
13           THE COURT:  All right.  Mr. Morgan?
14           MR. MORGAN:  Yes, your Honor.  Mr. Friedman suggested
15   that we're doing five minutes before and five minutes.  I
16   thought we 10 minutes be -- I've been operating 10 minutes
17   before and 10 minutes after and in the statement he also
18   suggested that if we were going to do a one to three.  I didn't
19   think that's something that we should have necessarily agreed
20   to, but it was put in there, but assuming that the last
21   installment we got, that's 380 hours, Judge.  If we do one to
22   three, we're still doing 127 hours worth of research and it's
23   still rolling, I'm concerned, there was some talk at our
24   meeting about a motion.  Judge, the government has made this
25   case almost impossible to defend in terms of the information
```

```
1    that they've given us.  It's not often that defense attorneys
2    complain about discovery, but this case has made it so hard if
3    we do what we've done on other cases, we'd be lucky to try this
4    case in September.
5           THE COURT:  All right.  Well, I'm trying to
6    understand everybody's position.  I assume the government
7    doesn't care how much time before and after an event it
8    includes in the materials.  Am I right about that?  Whether
9    it's one minute, three minutes, 10 minutes?  The government
10   doesn't care, right?
11          MR. GORGON:  No, your Honor.  The way it is, is the
12   list just has an event November 5th, 1:30.  It doesn't say
13   whether they can -- they can review the entire video.
14   That's --
15          THE COURT:  Are they getting the entire video then?
16          MR. GORGON:  Oh, they've he'd all of that.
17          MR. MORGAN:  Absolutely.
18          MR. GORGON:  All the list does your Honor is say here
19   are all these points in time to help you look at these events.
20          THE COURT:  All right.  So it's up to really each
21   individual attorney or that attorney's legal assistant under
22   the direction of the attorney to decide how much before and
23   after the government's pinpointing of an event that defendant's
24   defense team wants to look at.  Am I right about that?
25          MR. MORGAN:  That's correct, Judge.
```

1          THE COURT:  All right, so Mr. Morgan, I'm not

2     understanding then what exactly is your complaint here?

3          MR. MORGAN:  Well, I don't necessarily -- the

4     complaint Judge is that it's so time consuming, they've almost

5     prevented us from providing a defense.  We tried to flush this

6     out in a meeting and there was talk of bringing a motion.  I

7     don't know if that's going to happen.

8          Right now if we start from where we started from the

9     beginning, we've got 15,000 hours of discovery.  They have now

10    narrowed that down to probably 7,000 hours of discovery and

11    that does not include any of the pole-cam, we don't know what

12    they're going to do with that at all and when we start talking

13    about the budget concerns that we have.  When we talk, we don't

14    know what -- we and I think I speak for, don't know just how we

15    are to prepare for this thing.  Do we take the amount of time

16    that's necessary?  Like I said, I thought we were doing 10

17    minutes before and 10 minutes after.  That was something that

18    the defense counsels agreed upon, but by the time you get

19    around to setting it up and getting to it, that 10 minutes

20    before and 10 minutes after almost ends up being 30, 30 minutes

21    per event.

22          I'm just, just suggesting to the Court that the

23    amount of hours that are being put in this thing, the

24    government is only using it from their perspective and they

25    have eight or nine agents reviewing this, Judge.  Even one of

1    us only have one legal assistant assisting us.  That's all I'm

2    saying, Judge.

3            THE COURT:  Well, Mr. Morgan, how much time have you

4    or your legal assistant devoted to reviewing the submissions so

5    far?

6            MR. MORGAN:  Oh, God, Judge.  Probably two or 300

7    hours?  My legal assistant, we're on a second budget for him

8    already and now he -- and now he decided to do one for three,

9    for every, for every, for every he -- for every three minutes

10   he does, I'm doing one to cut down the time and we have large,

11   a large amount of discovery 'cause my guy goes back and goes

12   over it, talks about what's going on before and after and we're

13   writing notes as to what we believe is really happening versus

14   what's really happening as opposed to what the government says

15   is happening on it.

16           THE COURT:  Well, what if anything would you ask me

17   to do about any of this?

18           MR. MORGAN:  Nothing, Judge.  I, I guess I was just

19   venting.  I apologize.

20           THE COURT:  Okay.  Well, venting is good every once

21   in awhile, but let's see if you can focus here on what I can do

22   to move this along because as I said before, I want to make

23   sure we get through the case as expeditiously as possible for

24   all concerned.  So at this point, it seems like setting a

25   schedule does not seem more than a real stab in the dark here

1    because we really don't know when the discovery production is

2    going to be completed.  I suppose the best we could do is set a

3    date for another status report to be prepared and I'll

4    entertain a time frame for that.  Would that be some time in

5    September or end of August?  Mr. Gorgon, what do you think?

6           MR. GORGON:  Your Honor, August 14th will be the date

7    of our third production and I think if there was some status

8    conference after that, but before what we think the final

9    production date is, November 14th, so September?  That would be

10   a useful date.  Maybe the end of September.

11          THE COURT:  Are you talking about an in-person

12   conference?

13          MR. GORGON:  I think we can do that one by phone,

14   your Honor.

15          THE COURT:  Phone, okay.  How do the defense

16   attorneys feel about that.  Phone conference sufficient?

17   Anybody have any objection to that?  All right, I'm hearing no

18   objection.  All right, let's set that.  Are you saying early

19   September or end of September?

20          MR. GORGON:  I think end of September is better.

21          THE COURT:  All right.  September 27, 2:00 p.m.  Does

22   that work for everybody?

23          MR. EARLY:  Judge, I'll be in trial at that time.  I

24   start trial September 25th.

25          THE COURT:  So that week's no good?

```
1              MR. EARLY:  Yeah.  Can we do it the week before?
2              MR. ELDER:  I can't do it the week before.
3              THE COURT:  How's October 4?
4              MR. GORGON:  That date won't work for the government.
5    It's my wife's due date, so.
6              THE COURT:  Sounds like you're going to be occupied
7    potentially.
8              MR. GORGON:  Potentially, hopefully.
9              THE COURT:  Okay.  Well, can we try to do it the
10   beginning of September?  Is that too early?
11             MR. GORGON:  Umm, no.
12             THE COURT:  Would that okay or not okay?
13             MR. GORGON:  I think it's okay.
14             MR. MORGAN:  The second wage, Judge, of September?
15             THE COURT:  I'm going to look at a date right now.
16   How is September 5?
17             MR. GORGON:  That's good for the government.
18             THE COURT:  2:00.  Is that a problem for any defense
19   attorney?  Okay, so that's going to be our date for a phone
20   conference, September 5 at 2:00 p.m.
21             MR. GORGON:  And your Honor, I'll provide the numbers
22   as I've provided in the past.  I'll e-mail everybody a calendar
23   invite and make sure that's set, if the Court's okay with that.
24             THE COURT:  That's fine.
25             MR. EARLY:  Judge, I have a question for the
```

1    government, just want a clarification.

2            THE COURT:  Go ahead.

3            MR. EARLY:  Regarding the room numbers.  Are you

4    adding that to the new lists that are coming out, the next list

5    or did you add it to the May 14th list?

6            MR. GORGON:  I think where possible to identify, the

7    room numbers are on there.

8            MR. EARLY:  On May 14th?

9            MR. GORGON:  Yes and then the camera diagram points,

10   shows you the direction the camera's looking so you can see the

11   room numbers right where it would be, so it should be --

12           MR. EARLY:  Are you going do do anything with respect

13   to the original production and room numbers, the one that you

14   produced on --

15           MR. GORGON:  February 12th?

16           MR. EARLY:  The February 1st one.

17           MR. GORGON:  That has the same level of information,

18   like where possible it says room numbers.

19           MR. EARLY:  Are you going come out with room numbers

20   for that because it did not have room numbers on it, the first

21   one.

22           MR. GORGON:  I think where ever an agent could

23   identify the room numbers, at that point of review they

24   provided it.

25           MR. EARLY:  I don't think any were provided in the

1    first one.

2         MR. GORGON:  Yeah, it may not be able to.

3         MR. EARLY:  To do that?

4         MR. GORGON:  Yeah.

5         THE COURT:  Mr. Friedman?

6         MR. FRIEDMAN:  Yeah, one additional request.  If

7    possible on these clips, if a particular defendant or

8    defendants are present, if that could be indicated when the

9    list is provided, it would be very helpful.

10         MR. GORGON:  Your Honor, the list already shows where

11   possible with that level of review and that pace of review when

12   a defendant or suspected defendant's identified.

13         MR. MORGAN:  Well, I have one, Judge, for the

14   government.  Mr. Gorgon had said he was going to put these

15   installments in PDF form and he didn't the last ones we got.

16         MR. GORGON:  I am sorry, I didn't hear that.

17         THE COURT:  He said you were going to put it in PDF

18   form.

19         MR. MORGAN:  You said you were going to put it in PDF

20   form?

21         MR. GORGON:  It's in PDF.

22         MR. MORGAN:  Well, I guess it must be a, other way

23   then.  I'm -- we talked about a different way than the way he

24   did it I thought.

25         MR. GORGON:  I provided them both in the same

1    consistent PDF fashion.

2              MR. MORGAN:  I'll call you, Jerome.

3              MR. GORGON:  Okay, sir.

4              THE COURT:  All right.  I just want to circle back to

5    a couple things we've covered, but I don't think we completely

6    finalized.  The proposed protective order, when do you expect

7    I'll see that?

8              MR. GORGON:  By tomorrow.  By close of business

9    tomorrow.

10             THE COURT:  Okay and the issue of the table of

11   context or the index, do you want to have further discussion

12   about that or do I need to make a ruling about this?

13             MR. GORGON:  I don't even know what the table of

14   contents, what the proposed table of contents would contain and

15   I don't know how -- I'll talk to them more about it, Judge,

16   because I know it's easier for us to work out discovery stuff,

17   to not burden the Court with something we can work out so I'll

18   talk to them, but I don't, I don't understand what that would

19   look like, what kind of terms it would contain or --

20             THE COURT:  All right.

21             MR. GORGON:  -- why that would be the government's

22   responsibility to create that kind of work product for them.

23             THE COURT:  Well, here's what I'd like you to do.

24   I'd like you to continue talking about it and then if you have

25   reached an agreement, that's fine.  If you have not, then just

1    send me a one-page letter where each side lays out its position

2    and I'll decide the issue for you.

3              MR. GORGON:  Yes, your Honor.

4              THE COURT:  Now we do have a speedy trial issue to

5    address because I believe our clock goes through July 30, 2018

6    and so it looks like it's pretty clear we're not going to meet

7    that deadline.  Have the attorneys spoken to their clients

8    about waiving their rights regarding speedy trial and before

9    you answer that question, I guess we should decide what, if

10   we're going to waive, through what date are we going to waive.

11   Mr. Gorgon, do you have a view on that?

12             MR. GORGON:  I think that November date is a smart

13   date at this point because it would be when we expect to be

14   done with the production.  It will be after we've had the next

15   phone conference and the Court may be in a position at the next

16   phone conference to set an in-person status conference for

17   November that same time.

18             THE COURT:  Okay.  November what then is the exact

19   date?

20             MR. GORGON:  The exact date's November 14th, 2018.

21             THE COURT:  Okay, all right.  So do the attorneys

22   need to speak with their clients now about this issue and if

23   so, this would be your opportunity to do that and then I'm

24   going to have the attorneys ask their individual clients

25   questions on the record regarding waiver of their speedy trial

1    dates, so you'll have a moment now to have your discussions.

2    Go ahead

3              (Pause)

4              MR. EARLY:  Judge, Mr. Moore has said is there any

5    way he can talk to Mr. Morgan about this issue in private?

6              THE COURT:  I don't know how he can do that without

7    everybody hearing it.

8              MR. EARLY:  I think he wants to do it without

9    everybody hearing it.

10             THE COURT:  All right.  Well, we're going to have to

11   bring Mr. Ford back I know so --

12             MR. EARLY:  Oh, Mr. Avery, your Honor.  I'm sorry.

13             THE COURT:  Right.  It's Mr. Avery wants to talk to

14   Mr. Morgan.

15             MR. EARLY:  He wants to talk to Mr. Morgan.

16             THE COURT:  I understand, but I'm pointing out we're

17   going to have to bring back Mr. Ford because Mr. Evans isn't

18   here so I think we're going to have to cover, if --

19             MR. MR. MORGAN:  Judge, as to my client, I'll go see

20   him and have him sign a separate stip in the next 10 days.

21             MR. GORGON:  Your Honor, I could just do a stip and

22   order.  I'll talk to Mr. Morgan once he's had a chance to talk

23   to Mr. Avery and I'll talk to Mr. Evans after he's had a chance

24   to talk to Mr. Ford and then I'll get that stip in and I'll

25   make sure I follow-up with both --

```
 1              THE COURT:  Well, I'd like to have it on the record
 2    so I want to have the defendants on the record addressing the
 3    issue of speedy trial so we're going to have to bring back Mr.
 4    Ford.  I guess we're going to have to bring back Mr. Avery if
 5    he's to speak with Mr. Morgan.  All right, I see that -- well,
 6    no, we're not done.
 7              (Pause)
 8              THE COURT:  All right.  I believe the attorneys have
 9    finished their conversations with their clients so we'll start
10    around the table, so Mr. Magidson?
11              MR. MAGIDSON:  Yes, your Honor.  I did have a chance
12    to speak with Mr. Nero and explain to him what's going on and I
13    need to report to the Court that he's not inclined to waive his
14    speedy trial rights.  I explained to him the situation, but he
15    reminded me he has been detained awhile and I think I raised
16    that before.  It's a primary thing on his mind so for what it's
17    worth, that's his position.
18              THE COURT:  Okay.
19              MR. MAGIDSON:  And I understand his position, but I
20    leave it to the Court.
21              THE COURT:  All right.  Counsel?
22              MR. VENDITTELLI:  Nicholas Vendittelli on behalf of
23    Mr. Randol.  Mr. Randol, do you agree to extend your right to
24    speedy trial deadline beyond July?
25              DEFENDANT RANDOL:  No, sir.
```

1          THE COURT:  All right.  Mr. Early?

2          MR. EARLY:  Yes.  Mr. Pruitt has agreed to extend his

3  speedy trial guideline, your Honor.  Is that correct, Mr.

4  Pruitt?

5          DEFENDANT PRUITT:  Yes, sir.

6          MR. EARLY:  Okay.  You understand now that the speedy

7  trial deadline expires, I believe it's in July of this year?

8          DEFENDANT PRUITT:  Yes, sir.

9          MR. EARLY:  And we signed a stipulation to that

10  effect previously?

11          DEFENDANT PRUITT:  Yes, sir.

12          MR. EARLY:  Okay and you're agreeing to extend it out

13  now until what date is it?

14          THE COURT:  November 14.

15          MR. EARLY:  November 14, 2018?

16          DEFENDANT PRUITT:  Yes, sir.

17          MR. EARLY:  And your Honor, if I could take this

18  opportunity now, Mr. Pruitt as well as Mr. Nero informed me

19  just a couple minutes ago that they cannot really view these

20  videos in any rapid manner whatsoever because of the conditions

21  imposed at the Midland jail.  Unlike Sanilac where they give

22  people apparently all day to look at videos in various rooms or

23  in a room there, at Midland the opportunities to view the video

24  are very limited.  Sometimes maybe they only get an hour a

25  week.

```
 1              DEFENDANT PRUITT:  It's three times a week, but if
 2    just say they have a lot of intakes in, you know, they clear
 3    them, if we missed, we have one, if we miss one setting, we --
 4              DEFENDANT NERO:  We miss the first setting, we're not
 5    allowed to see another --
 6              THE COURT:  Just a minute.  We can only have one
 7    person talking at a time.
 8              MR. EARLY:  If they could explain it -- if you could
 9    explain it, Mr. Nero, to the judge?
10              DEFENDANT NERO:  Mr. Nero speaking.  This is the
11    situation what I discovered.  We have to sign up 24 hours ahead
12    of time.  Only if it's possible room in intake at that time the
13    following morning prior to the 24 hours that we sign up, that's
14    the only time that we can get in there to start our day.  If we
15    miss the first initial setting of our discovery, we can no
16    longer for the rest of the day have access to it as well.  Then
17    they only allow us five days a week, you understand what I'm
18    saying?
19              Also the other situation with this problem is that
20    they only give us the amount of time that's allotted with the
21    battery charge that's on our laptop.  Once that time runs out,
22    that's, our discovery is done.
23              THE COURT:  How long is the battery charge?
24              DEFENDANT NERO:  Umm, I was just down there recently
25    maybe four days ago and I believe it's got about two and-a-half
```

1   hour, two and-a-half hours on it.

2          THE COURT:  So the maximum time per day is two

3   and-a-half hours?

4          DEFENDANT NERO:  No, the maximum time day is to --

5   see, we have a three-period lockdown.  We're locked down after

6   breakfast so we can start our discovery after eight if it's

7   allotted time.  So from eight to 10:30, then we would do lunch

8   so when we come off lockdown at lunch it be 1:30, maybe 2:00

9   sometimes, you know what I mean, umm, and then it goes from

10  2:00 to say 3:30, 3:45.  Then we go in, we eat lunch -- I mean

11  we eat dinner.  We come off dinner break at six, 6:30 -- no, we

12  come off dinner break at 6:30, sometimes seven and then we can

13  go down there to maybe like 9:00.  So we only making, we only

14  getting a progression of maybe two and-a-half, possibly three

15  hours sometimes and three hours would be stretching it.

16         MR. EARLY:  And it's one person because they are

17  separatees, your Honor, so when he's talking about viewing,

18  he's talking about one person.  The other person can't view in

19  the jail because he's viewing.

20         MR. MAGIDSON:  The problem was -- this is Mark

21  Magidson.  The problem was is that the device that Mr. Nero had

22  that I purchased for him broke.  I got -- I went up there and

23  got that back, sent it to Mr. Antone, said that it's burned

24  out, something happened, he doesn't know, it can't be repaired

25  and so he was using Mr. Pruitt's device where or he tried to --

1          DEFENDANT NERO:  No, tried to.  They wouldn't allow

2     it.

3          MR. MAGIDSON:  -- but because there's a separation

4     order that the government has, they're not allowed to, umm --

5          MR. EARLY:  Share.

6          MR. MAGIDSON:  -- share so I think if the government

7     would rescind that order because they're not antagonistic to

8     one another and so forth, they're still at the same facility,

9     that would facilitate these defendants at least at Midland for

10    being able to view their discovery.  So I think what, part of

11    the impediment is a separation order that the government has

12    imposed so if that could be rescinded, at least then these two

13    gentlemen who are in Midland would double up on their ability

14    to view the discovery.

15         THE COURT:  All right.  Let me ask a question or two

16    here.  Mr. Early, is this two hours per session in the morning,

17    the afternoon and evening for a total of about six?  Is that

18    right?

19         DEFENDANT NERO:  Yes, sir.

20         DEFENDANT PRUITT:  May I reiterate, your Honor?

21         MR. EARLY:  May Mr. Pruitt speak, your Honor?

22         THE COURT:  Yes, go ahead.

23         DEFENDANT PRUITT:  Like Mr. Nero said, once you miss

24    that initial two hours, they're done for the rest of the day

25    and like you say, my laptop is when you use it and just say the

```
 1    battery may say two hours, but it don't last that long.  It may
 2    last an hour and-a-half.  It may say two hours on the screen,
 3    but it, the juice actually runs out way quicker.  We constantly
 4    moving the videos, you know, we jumping from screen to screen
 5    so the more you, the more you use it, the quicker the battery
 6    leaves out of it.  The quicker the juice leaves.
 7              THE COURT:  All right.  Let me address these issues
 8    separately.  Let's stay focused right now on the speedy trial
 9    issue and then we'll come back to this other issue.
10              MR. EARLY:  I just was informed that they cannot
11    charge the battery, they have to allow the law enforcement
12    people there to charge the battery so that's another problem.
13              THE COURT:  All right.  So Mr. Early, your client is
14    agreeable to waiving his speedy trial rights?  Is that right?
15              MR. EARLY:  I believe he has, your Honor.  That is
16    correct.
17              THE COURT:  Okay, that's Mr. Pruitt and now
18    Mr. Friedman?
19              MR. FRIEDMAN:  Yes, your Honor.  I've discussed this
20    with my client and as she has done previously, she is willing
21    to waive her speedy trial rights.  Is that correct, Ms. Gaggo?
22              DEFENDANT GAGGO:  Correct.
23              THE COURT:  All right and you understand that would
24    be through November 14, 2018?
25              DEFENDANT GAGGO:  Yes, sir.
```

```
 1          THE COURT:  All right, who else?  Mr. Elder?

 2          MR. ELDER:  Your Honor, I've discussed with Mr. Yako

 3   his right to a speedy trial, your Honor. He understands that

 4   now the new date would be November 14th.  Your Honor, as we've

 5   done before, he's waived his right to speedy trial to that

 6   date.

 7          THE COURT:  All right.  Do you want -- I'm sorry, I

 8   didn't hear a question and answer.  Go ahead.

 9          MR. ELDER:  Is that correct, sir?

10          THE INTERPRETER:  Yes.

11          THE COURT:  All right.

12          MR. ELDER:  Thank you, your Honor.

13          THE COURT:  Okay.  Mr. Burgess?

14          MR. BURGESS:  Thank you, your Honor.  I've spoken to

15   my client regarding his right to speedy trial in this matter.

16   He is waiving his speedy trial rights through November 14th of

17   2018.  Is that correct, Mr. Gabrail?

18          DEFENDANT GABRAIL:  Yes.

19          MR. BURGESS:  Thank you, your Honor.

20          THE COURT:  All right.  Well, let's return to this

21   issue then about difficulties some defendants are having

22   reviewing materials.  Mr. Gorgon, do you have any suggestions

23   you'd want to make at this point?

24          MR. GORGON:  No.

25          THE COURT:  That's probably not the most helpful
```

1    thing you've said about this case.

2            MR. GORGON:  I don't know about the, the workings of

3    a given defendant's schedule in one of those facilities.  The

4    BOP or whoever's making those decisions, they're a separate

5    entity.  I don't have any influence over what they're doing and

6    what their procedures are for reviewing videos.  I don't think

7    I'm even in a position to be able to help to change those

8    protocols --

9            MR. MAGIDSON:  Well, Judge --

10           THE COURT:  Just a minute.  Let's not interrupt.  Go

11   ahead, Mr. Gorgon.

12           MR. GORGON:  So I don't think the U.S. attorney's

13   office is in a position to change the protocols at those

14   detention facilities.  The second thing is I'm happy to discuss

15   the rationale for the separation orders off the record or at

16   side Bar, but Mr. Magidson's statements don't impact the

17   government's rationale for requesting those separation orders.

18           THE COURT:  Okay.  You're done?

19           MR. GORGON:  Yes, your Honor.

20           THE COURT:  All right.  Mr. Magidson?

21           MR. MAGIDSON:  I think he just answered it.  I was

22   going to request that the government voluntarily release or

23   remove those separation orders.  I think we've heard that they

24   have reasons that they're not willing to disclose presently or

25   at least in open court.  It may be that I need to talk to the

1    government or file a motion.

2         THE COURT:  Okay.  All right, well, here's what I'm

3    going to do.  As far as difficulties the defendants may be

4    having, if any attorney wants to, he may send me a letter that

5    details the exact nature of the problems and I will see to what

6    extent the jails can make accommodations or whatever changes to

7    protocol that might be possible consistent with security needs

8    with a goal toward accelerating review of the materials by the

9    defendants.  So Mr. Early, if you want to send me a letter, if

10   any other defense counsel has a client who's having difficulty

11   reviewing materials, send me a letter and I will see what can

12   be done to address those issues.  Please send a copy to the

13   attorney for the government.

14        MR. EARLY:  Yes, your Honor.  Mr. Magidson and I will

15   confer on that.

16        THE COURT:  All right.  I would also suggest in my

17   experience, jails are often willing to be helpful in solving

18   problems so you may want to contact the authorities there first

19   and point out the difficulties your clients are having, see if

20   they can come up with a solution even before you approach me

21   because I think it would be helpful to see if they can come up

22   with something without having to involve the Court.  All right,

23   is there anything else that we need to address at this point?

24        MR. GORGON:  Just the Court's finding on the speedy

25   trial issue for Mr. Nero and Mr. Randol.

1            THE COURT:  Well, I think it might be appropriate for

2    the government to file an appropriate motion regarding speedy

3    trial because we do have some defendants who haven't waived and

4    in fact we have some defendants who've expressly said that they

5    are not going to waive, so is that something you can get on

6    file in the not-too-distant future?

7            MR. GORGON:  Absolutely.

8            THE COURT:  All right.  Why don't you do that and of

9    course all defendants will be able to respond to it and then I

10   can make a ruling on what gets submitted.

11           MR. GORGON:  Your Honor, should I limit that motion

12   to the two defendants and do a separate stipulation for the

13   other defendants or just put it all on one?

14           THE COURT:  Well, I'm going to be issuing an order to

15   Mr. Evans and also to Mr. Morgan to have them appear with their

16   clients so we're going to take up the issue of speedy trial and

17   the failure to be here in person and the consequences for that.

18   So if those defendants end up waiving their speedy trial

19   rights, they are not going to be really impacted by your motion

20   so I think you can prepare your motion at this point because

21   you know that there are at least two who have not said they are

22   waiving their speedy trial rights and there might be two more.

23           MR. GORGON:  Understood.

24           THE COURT:  But as long as there's one who is not

25   waiving, then I think we need to have a government motion and a

1    ruling by the Court on it.

2           MR. GORGON:  Understood.  Thank you, your Honor.

3           THE COURT:  All right.  Anything further then from

4    the defense side?  All right, then that concludes our hearing.

5    Thank you.

6           (Hearing concluded at 4:08 p.m.)

7                      --    ---    --

1               C E R T I F I C A T E

2

3

4

5

6

7          I, David B. Yarbrough, Official Court

8    Reporter, do hereby certify that the foregoing pages

9    comprise a true and accurate transcript of the

10   proceedings taken by me in this matter on Wednesday, May

11   23rd, 2018.

12

13

14

15

16   10/17/2018              /s/ David B. Yarbrough

17   Date                    David B. Yarbrough,
                             (CSR, RPR, FCRR, RMR)
18                           231 W. Lafayette Blvd.
                             Detroit, MI  48226
19

20

21

22

23

24

25