UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

   Plaintiff,

                Case No. 17-cr-20183-2

v

                HON. MARK A. GOLDSMITH

D-2 JANETTE GAGGO TAWFIK,

   Defendant.

_____/

**OPINION & ORDER**
**DENYING DEFENDANT'S MOTION TO**
**REVOKE THE DETENTION ORDER (Dkt. 522)**

This matter is before the Court on Defendant Janette Gaggo Tawfik's motion to revoke the detention order (Dkt. 522). Tawfik contends that the excessive length of her pretrial detention has risen to the level of a due process violation. For the reasons that follow, Tawfik's motion is denied.

## I. BACKGROUND

A grand jury indicted Tawfik on fifteen charges stemming from her alleged role in a large-scale human-trafficking and drug-distribution conspiracy at the Victory Inn hotel (the "Victory Inn") in Dearborn, Michigan. Superseding Indictment (Dkt. 98). Following a hearing before the magistrate judge, Tawfik was ordered detained pending trial. Order of Detention (Dkt. 28). Tawfik then requested pretrial release from this Court. After a hearing on April 6, 2017, the Court found that although Tawfik had rebutted the presumption of detention under 18 U.S.C. § 3142(e), consideration of all of the evidence, as well as the factors set forth under 18 U.S.C. § 3142(g), required detention. See United States v. Tawfik, No. 17-20183, 2017 WL 1457494, at *8 (E.D. Mich. Apr. 25, 2017). The Court concluded that "Tawfik presents a danger to the community and

a risk of flight, and that no condition or combination of conditions could reasonably assure the safety [of] the community and her appearance in court." Id.

More recently, Tawfik filed a motion to reopen her detention hearing under 18 U.S.C. § 3142(f)(2), arguing that the emergence of the COVID-19 pandemic constituted new and material information bearing on her health and physical condition (Dkt. 428). The Court denied this motion, finding that Tawfik had not established that her pretrial release was warranted in light of the risks presented by the pandemic. United States v. Tawfik, No. 17-20183, 2020 WL 1672655, at *4 (E.D. Mich. Apr. 6, 2020).

Tawfik now challenges the detention order for a third time, arguing that the duration of her pretrial incarceration violates due process. Accordingly, she requests that the Court release her to home confinement with electronic monitoring.

## II. ANALYSIS

Tawfik maintains that the expected length of her pretrial incarceration violates due process. Tawfik has been in custody for 44 months, since the time of her initial appearance on March 30, 2017. With a three-month trial scheduled to begin on May 24, 2021, Tawfik will have been in custody for approximately 53 months by the time trial concludes.

The Supreme Court has ruled that as a general matter, pretrial detention under the Bail Reform Act "is regulatory in nature, and does not constitute punishment before trial in violation of the Due Process Clause." United States v. Salerno, 481 U.S. 739, 746-747 (1987). However, the court expressly stated that it "intimate[d] no view as to the point at which detention in a particular case might become excessively prolonged, and therefore punitive, in relation to Congress' regulatory goal." Id. at 747 n.4. Consequently, it is well established within the Sixth Circuit that an excessive duration of pretrial detention can violate due process. United States v. Watson, 475 F. App'x 598, 601 (6th Cir. 2012). The Sixth Circuit evaluates four factors in

2

determining whether pretrial detention is unconstitutionally excessive: "(1) the length of the detention; (2) the extent of the prosecution's responsibility for the delay of the trial; (3) the gravity of the charges; and (4) the strength of the evidence upon which the detention was based." Id. The Court evaluates each of these factors in turn.

### 1. Length of the Delay

With respect to the first factor, Tawfik maintains that her pretrial detention has been so lengthy as to become the dispositive factor of the analysis. Mot. at 10 (Dkt. 522). Tawfik notes several cases treating similar durations of pretrial detention as the governing factor in concluding that the defendants' continued incarceration violated due process. Id. at 7-10. For example, in United States v. Ojeda Rios, 846 F.2d 167, 169 (2d Cir. 1988), the Second Circuit ordered the defendant's release where he had been in custody for 32 months on charges of bank robbery and where trial was not anticipated to begin for several months. And in United States v. Omar, 157 F. Supp. 3d 707, 717 (M.D. Tenn. 2016), the court held that the defendant's pretrial incarceration of over four years amounted to a due process violation, even though the Government was not responsible for a substantial part of the delay and even though the defendant stood accused of sex-trafficking minors. Finally, in United States v. Rodriguez, No. 09-CR-331A, 2012 WL 6690197, at *1, 13 (W.D.N.Y. Dec. 21, 2012), the court held that where the defendant was charged with drug offenses, firearm possession, and racketeering, 50 months of pretrial detention, by itself, offended due process.

However, caselaw establishes that "the length of pretrial detention is not dispositive, and will, by itself, rarely offend due process." Watson, 475 F. App'x at 601 (citing United States v. El-Hage, 213 F.3d 74, 79 (2d Cir. 2000)). Instead, where pretrial detention is expected to last more than two years, "the length of detention prong of the due process analysis weighs strongly in favor of releas[e]," and it "follows that the other two prongs—government responsibility for delay and

3

threats to the government's regulatory interests (flight/dangerousness)—will have to weigh strongly in favor of the government to justify continued detention." United States v. Ailemen, 165 F.R.D. 571, 591 (N.D. Cal. 1996); see also United States v. Briggs, 697 F.3d 98, 101 (2d Cir. 2012) ("The longer the detention, and the larger the prosecution's part in prolonging it, the stronger the evidence justifying detention must be if it is to be deemed sufficient to justify the detention's continuance.").

While Tawfik's 44-month pretrial detention has been lengthy, it is not unprecedented. Other cases have upheld pretrial detentions of similar durations in the face of due process challenges. In United States v. Noble, No. 1:17-05, 2020 WL 3487845, at *5 (W.D. Pa. June 26, 2020), the court held that the balance of the factors favored continuation of the defendant's 41-month pretrial detention, given that the defendant was charged with serious drug trafficking offenses and had a history of violating the terms of court supervision. Similarly, in United States v. Flores, No. 2:14-cr-00684, 2018 WL 3530837, at *2 (C.D. Cal. July 20, 2018), the court held that a defendant's 43-month detainment, where the total detainment was expected to last for 52 months, did not violate due process. The court noted that the balance of the factors weighed in favor of detention, as the defendant was charged with serious racketeering and drug-trafficking offenses, the Government bore little responsibility for the delay, and the defendant's criminal history indicated multiple probation violations. Id. at *3.

Yet another court upheld a pretrial detention expected to last for 55 months, where the defendant was charged with various offenses including racketeering, murder in aid of racketeering, and a drug-trafficking conspiracy. United States v. Speed, No. 09–CR–329, 2013 WL 6531950, at *5 (W.D.N.Y. Dec. 12, 2013). Although the length of detention weighed in favor of the defendant's release, the remaining factors strongly favored the defendant's continued detention. Id. at *4. Nevertheless, the court noted that "there could come a point, in the near future, where

4

the length of detention alone warrants reconsideration of defendant's request." Id. at *5; see also United States v. Robinson, No. 10–CR–239S, 2014 WL 2207970, at *4 (W.D.N.Y. May 28, 2014) (continuing a pretrial detention of over 40 months without prejudice to renewal of the motion in six months on due-process grounds). In light of this authority, while the length of Tawfik's pretrial incarceration weighs in favor of her release, it is not dispositive of the matter. Thus, the Court proceeds to evaluate the remaining factors.

### 2. Responsibility for the Delay

Turning to the parties' relative contributions to the delay, it does not appear that the Government is at fault for prolonging the proceedings. Tawfik made her initial appearance before the Court on March 30, 2017, and a superseding indictment was promptly filed on August 23, 2017. By December 5, 2017, the parties, including Tawfik, stipulated to a schedule whereby the Government was to produce lists of video segments ("Review Lists") that it intended to introduce at trial from among the approximately 15,000 hours of video surveillance from the Victory Inn. 12/5/17 Stipulation & Order (Dkt. 171). While the stipulated order provided that Review Lists would be produced on February 14, 2018, and May 14, 2018, with additional productions continuing every 90 days as necessary, Tawfik faults the Government for producing additional lists after those dates. Mot. at 11. However, the stipulated order expressly stated the parties' recognition that May 14, 2018 was not a "cut-off," and that the Government was not precluded from providing additional Review Lists as it completed its review. 12/5/17 Stipulation & Order at 3. Additionally, Defendants, including Tawfik, agreed to a final production of the Review Lists by February 14, 2019. See 9/6/18 Stipulation (Dkt. 206).

Tawfik contends that technical issues with discovery resulted in delays in reviewing the discovery materials. Mot. at 11. But there is no indication that the Government failed to diligently review the surveillance video or to compile the Review Lists. As described above, the Government

has timely produced discovery in accordance with an agreed-upon schedule and has responded to a variety of pretrial motions, including several filed by Tawfik.

In fact, at least two years of the delay is attributable to the Defendants' need to review the discovery materials. The parties initially agreed that Defendants' review would be confined to those portions of the surveillance video that the Government intended to use at trial. See Joint Statement Regarding Discovery at 2 (Dkt. 184). However, Defendants later expanded their review to the entirety of the surveillance video, on the theory that the video may contain exculpatory evidence. Given Defendants' need for additional time to review the voluminous amount of discovery, Tawfik repeatedly stipulated over the course of two years to a series of continuances through September 9, 2020. See 12/5/17 Stipulation & Order at 3-4; 2/1/19 Stipulation & Order at 2 (Dkt. 272); 2/1/19 Pruitt Stipulation & Order at 2 (Dkt. 290); 11/7/19 Stipulation & Order at 3 (Dkt. 368). While the Court does not fault Defendants for their legitimate desire to fully review the surveillance video, it likewise does not fault the Government for this delay.

For the past nine months, the proceedings have been delayed as a result of restrictions imposed by the Court in response to the COVID-19 pandemic. Since March 25, 2020, the Court has remained closed to the public. It has indefinitely postponed in-court proceedings, including trials, given the impairment of counsel to prepare for trial, the "reduced ability to obtain an adequate spectrum of jurors," and recommendations from public health organizations to limit the presence of counsel and court personnel in the courtroom. Administrative Order 20-AO-039; see also Administrative Order 20-AO-038 (revised) ("Jury trials will commence on a date yet to be determined, and then only for critical criminal trials."). It is uncertain when the Court will reopen to personnel or the public, let alone when jury trials will resume. Accordingly, the Court has held that it is unable to hold a jury trial in a manner that promotes public safety until, at the earliest, May 2021.

Other courts confronted with the issue have held that delays occasioned by the pandemic have not violated due process and are not attributable to the Government. See, e.g., United States v. Bradley, No. 3:16-cr-50008, 2020 WL 6703802, at *4 (W.D. Va. Nov. 13, 2020) (holding that the prosecution was not responsible for pretrial delays attributable to the logistical challenges surrounding travel during the pandemic); United States v. Shipp, No. 19-CR-29, 2020 WL 3642856, at *3 (E.D.N.Y. July 6, 2020) (holding that a pretrial detention expected to last for 20 months did not offend due process "when viewed in light of the extenuating circumstances of the COVID-19 pandemic and the danger Mr. Shipp poses to the community"). Likewise, this Court finds that neither Government counsel nor the defense is responsible for the pandemic-related delay between March 25, 2020 and the new trial date of May 24, 2021.

Ultimately, the extended period of pretrial delay in this matter is the product of the defense's legitimate desire to review an extraordinary amount of material, coupled with an unprecedented and unforeseeable pandemic that has overwhelmed and interfered with every sphere of human activity—with the administration of justice as no exception. This confluence of events occurred through no fault of Government counsel. Accordingly, this factor is neutral with respect to Tawfik's continued detention.

### 3. Gravity of the Charges & Strength of the Evidence

The final two factors of the due process analysis overwhelmingly weigh in favor of Tawfik's continued detention. Tawfik is alleged to have taken a managing role in an extensive human-trafficking and drug-distribution conspiracy, acting as leader and co-Defendant Darrick Bell's right-hand associate. Tawfik, 2017 WL 1457494, at *8. These offenses carry stiff penalties, including mandatory sentences of 15 to 20 years, and up to life in prison. And the evidence of Tawfik's dangerousness to the community is strong. Surveillance video documented "hundreds of drug transactions; widespread prostitution; violence; and members of the conspiracy, including

Tawfik, involved in these activities." Id. at *3.  Video clips shown at the initial detention hearing showed Tawfik brandishing a firearm, as well as "drug transactions, forcible movement of human-trafficking victims, and drug use (including at least one apparent overdose that lasted a considerable amount of time yet went unaddressed)."  Id.  The Government's proffered evidence further demonstrated that the conspirators, including Tawfik, employed violence, threats, degrading actions, as well as administered dangerous, addictive drugs to coerce human trafficking victims into committing commercial sex acts.  Id. at *5.  According to witnesses, Tawfik "instructed prostitutes to get to work, and she was so abusive to some female victims that they referred to her as the 'Dragon Lady.'"  Id. at *7.

Further, although Tawfik has only a limited criminal history and has strong family ties to the area, the Court previously noted that these attributes are undercut by her poor character and lack of trustworthiness.  Id.  For example, the Court noted Tawfik's troubling decision to bring Bell, a convicted murderer and drug dealer, into her home with her children.  Id.  Although Tawfik claimed ignorance of Bell's criminal record, she admitted that she was aware of the criminal activities he allegedly undertook at the Victory Inn.  Id.  Additionally, Tawfik vehemently denied before the magistrate judge that she had been romantically involved with Bell, a representation that was later proven false.  Id. at *4.  Although Tawfik now contends that she denied her involvement with Bell because she was embarrassed, the fact remains that she admittedly lied to the magistrate judge.  See Mot. at 12.  Tawfik's poor character and untrustworthiness greatly reduce the value of her assurances that she would pose no danger or flight risk if she were released to home confinement at a home shared with her husband and four children.

Given the strength of the evidence demonstrating Tawfik's alleged role in a particularly egregious conspiracy to distribute drugs and force women into prostitution, as well as her poor character and lack of trustworthiness, these final two factors overwhelmingly favor Tawfik's

continued detention.

Tawfik relies heavily on the Sixth Circuit's unreported decision in United States v. Nagi, No. 09-1995 (6th Cir. Dec. 14, 2009), in arguing that due process compels her release. Mot. at 3-4. In that case, the Sixth Circuit held that due process compelled Nagi's release, where he had been detained for more than three years, and where the Government bore some responsibility for a two-year delay between Nagi's arrest and a superseding indictment. Nagi, No. 09-1995, slip op. at 3. The court further reasoned that while the racketeering charges against Nagi were serious, they did not include the conspiracy to commit murder charges faced by some co-defendants who remained free on bond. Id. Further, the flight risk and danger posed to others by Nagi's release could be mitigated through surrender of his passport, house arrest, and electronic tether. Id.

The present case, however, is distinguishable from Nagi. Here, as discussed above, the Government is not responsible for any part of the delay. And unlike Nagi, Tawfik faces charges equally as serious as her co-defendants, the majority of whom are also detained. Finally, the Court remains unconvinced that electronic monitoring would assure Tawfik's appearance or avoidance of activities that pose a danger to the community. See Tawfik, 2017 WL 1457494, at *8. Tawfik's reliance on Nagi is, therefore, unavailing.

Ultimately, although the length of Tawfik's pretrial detention weighs heavily in favor of her release, the gravity of the charged offenses and the strength of the evidence of Tawfik's dangerousness and untrustworthiness weigh even more heavily in favor of her continued detention. Additionally, the worldwide pandemic represents a circumstance outside the parties' control preventing the Court from proceeding to trial until, at the earliest, May 2021. Nevertheless, the Court is troubled that Tawfik has been in pretrial custody for a prolonged period of time and does not rule out the possibility that there could come a point where the length of detention warrants her release. Accordingly, Tawfik's motion to revoke the detention order is denied without

prejudice to her ability to renew her motion should trial not begin by May 2021.

### III. CONCLUSION

The Court finds that Tawfik's pretrial incarceration does not violate due process. Accordingly, Tawfik's motion to revoke the detention order is denied without prejudice to her ability to renew the motion should trial not begin by May 2021.

SO ORDERED.

Dated: December 11, 2020             s/Mark A. Goldsmith
Detroit, Michigan                           MARK A. GOLDSMITH
                                          United States District Judge